and counsel for the appellant. You may proceed.  Mr. Nerey's appeal is based on five specific issues. Issue number one were comments made by the government on redirect of a witness as well as four comments during closing arguments. The arguments and the commentary made by the government during the closing arguments and during redirect shifted the burden to the defense. In my brief, I specifically cited the five comments and made references to the transcript. The first comment, which was during redirect, and the district court sustained the objection, was did he ask you anything regarding any conversations? Did he ask you anything? Meaning the defense attorneys are in cross. That is the first instance where the government shifts the burden by implying that the defense has to do something and actually has to ask anything from any of their witnesses that the government poses. Thereafter, four comments were made during closing arguments. Not all of them, at least from my perspective, not all of the comments potentially shifted the burden. For example, the one about you'll hear from the defense attorney that you shouldn't believe these witnesses because they're all friends and they all got together. How does that shift the burden? That would be the second comment? I forget what number it is. I think it's the last one during closing argument. But as to that one, how does that shift the burden? You will not hear from the defendant in regards to X, Y, and Z from the defense attorney. Technically, we don't know. No, but that's not the comment. The comment is now you will hear from the defendant's attorney that you shouldn't believe those witnesses because they're all friends and they got together. On that comment, I don't see a shift of a burden. It may be inappropriate in some other way maybe, but I don't see how that shifts the burden when it's talking about an argument that the defense has made throughout trial that the co-conspirators shouldn't be believed. I would concede that that is one of the lesser comments, but when taking them all as a whole, all five, four being in a compressed closing argument, it does shift the burden altogether. In that one, it says you will hear from the defense attorney, X, Y, and Z, you shouldn't believe them. That's fine. That's argumentative. However, when taken as a whole with the other three comments, going back to the comment they said before of they can't explain where the money came from or they can't explain, the defense can't explain about the millions of dollars that he received from the fraud. When taking that together with the last comment and the previous, I said it, I referred to it as comment number two. When taking that all as a whole, they do shift the burden and yes, the government, they did this intentionally throughout the entire closing argument four times. The judge sustained, I believe, three of the four and gave curative instructions. Yeah. I thought he has sustained each of the ones you made. The one with respect to what had been conceded, as I read it, the counsel just began half a sentence. You objected. The judge said, no, go ahead. The counsel finished the sentence and then you didn't object any further. Did I misread that? That was what I count as the third one with respect to whether the defense counsel conceded that the companies were fraudulent remark. I thought that every one where an objection was completed, it had been sustained. I believe there was one, which one I referred to as comment number three, the objection was overruled. What you call the objection was he'd only gotten about, the counsel for the government had only gotten about five words out of his mouth, so that at that point there was nothing to object to and it wasn't renewed, wasn't objected again when the sentence was finished. Am I right about that? Yes. Yes. That's correct. Then the fourth comment, that was the comment about the million dollars and how the defense cannot explain how the quarter of a million dollars from the scheme was obtained. In regards to the, if your honors have no further question, I'd move on to my next issue. In regards to my next issue was the interview of juror number four. This was kind of a unique issue. After the jury came back, when the verdict came back, a juror was wearing a t-shirt that said American Greed on it, a fluorescent green t-shirt with bold black letters. This jury, during the questionnaire, filled out the questionnaire and he said he had, he could be fair and impartial, he had absolutely no biases, and he did honestly seem like the perfect juror. However, after seeing this t-shirt, I followed a motion with the court to interview the juror, I believe it was juror number four. Did no one see the jury that morning? I know they deliberated the night before and I don't know what the procedure is in terms of whether the jury is gathered before they go to deliberate again. The jury had no questions. No, I don't believe, I did not see the jury until the verdict. In your brief, you make a point about it was green and large and fluorescent. You also presumably saw it when the jury came in. I did see it when the jury came in. You didn't ask to approach the bench or raise anything at that point? At that point, I didn't really think about it. You thought they might win. You thought you might win at that point. With a shirt like that, I figured I was not going to win. But I don't know if he was the fourth person or not, but in any event, I didn't really put two and two together until I got to my office and I frankly went on the internet and then researched the show and then the show sells shirts. And the theme of buying this shirt is to show people that you're not a sucker and this show. I think the government alleges that the T-shirt, whatever it was, was not one that was sold by the television show. Is that in the record either way? When I did the research, they were selling these shirts. I did the research yesterday and then now there are spin-offs saying the same thing. By other... But not exactly the same. I don't want to mislead the court. I don't know what people are selling now on Amazon.com, but that is the issue. And I wrote in my motion, as I did in my brief, that we should have ironed out that issue. This juror clearly had that shirt. He clearly was an avid viewer of this television show, which the theme is show individuals that you are not a sucker. And he clearly... I wanted to inquire if he had bought that shirt specifically to wear the day of the verdict, if he had owned this shirt before the verdict and before the trial. And he thought, well, this is a trial similar to what I watch, and he's going to show his defendant that I'm not a sucker. And I wanted to explore that after the verdict, specifically because he wore that shirt. When you filed... How much different would that be? I mean, you frequently... I didn't do a lot of trial work, but you frequently see jurors come in and you read their attitude. They're either smiling at you or they're smiling at the other side. They're giving thumbs up one thing or another. And we don't generally allow you to examine who they're waving to or who they're smiling to. Isn't this sort of the same kind of thing? Well, this wasn't a subtle thing where the jury comes back and doesn't look at the defendant or looks at the defendant or the juror crying. This was a specific... And again, I even said it in my brief, the juror can express whatever First Amendment right he wishes to express. But this was something that needed to be explored because this was a direct comment. And it's not... This shirt is something that needs to be purchased beforehand to support a football team. You can buy a t-shirt outside of the stadium. This is something that you need to buy beforehand. When you filed your motion, Mr. Issaidi, did you specify to the district court what questions you wanted to ask? I did not. I did not. I filed the motion... The jury came back after lunch. I think I filed my motion by 4 o'clock. I left the courthouse and went straight to my office and did as much legal research as I could regarding this t-shirt and then filed my motion. The third issue on my brief is in regards to 404B evidence that was admitted. The 404B evidence there is significant issues with... There is three issues in regards to 404B. One, they admitted evidence of other crimes from other home health agencies that Mr. Norea was involved with. They said, in regards to the second issue, in regards to 404B, that he knew that the claims were not medically necessary. And third, there was an issue with an informant by the name of Mr. Suarez. There was commentary about whether him and a co-defendant potentially wanted to harm the informant. On that last issue, doesn't that go to consciousness of guilt? In other words, that the comments could be interpreted as a mindset to keep a witness quiet or at least get that witness to not cooperate. And so it wouldn't be for propensity purposes, but to show that there were attempts made to keep the conspiracy going and to keep it from detection. But the commentary was primarily made by a co-defendant who was named Jesus Perez. At that point, he was in Spain, and he said he wanted to do certain things to the informant. And I believe the appellant, Mr. Norea, simply affirmed yes. However, the conspiracy at that point was over. Let's say the cat was already out of the bag. The informant had been cooperating for a long time, and I think there was already one indictment in regards to the case that the informant had worked in where everybody was already arrested. So I don't really, my position is that the conspiracy was already over. This was all after the fact. There was no concrete evidence that this happened, being that they just gave a physical description of the appellant, Mr. Norea. Mr. Suarez gave a physical description of someone that was tall and bald. There wasn't concrete evidence that the appellant had made any comments or called. I think that he didn't even directly know Mr. Norea. Mr. Suarez had made numerous recordings, none of which consisted of any recordings of Mr. Norea. Would Your Honor like me to move on to my next point, or? Actually, your time has expired. Yes, I've exceeded my time. So you have saved time for rebuttal. Yes. Of the United States. May it please the court. Daniel Marcet on behalf of the United States, with me at council table, is one of the trial attorneys in this case, DOJ trial attorney, Beth Young. After a five-day jury trial in which overwhelming evidence of the defendant's involvement in this kickback conspiracy was presented, the jury found him guilty. None of the errors pointed to by the defense are in fact errors, let alone prejudicial. So I'd like to turn to the juror t-shirt issue. Again, the standard there with the interview of the juror is abuse of discretion. And the defense noted that based on the questions that were actually asked during Watt-Dyer, he seemed like a perfect juror. And under Eleventh Circuit case law, it's clear that it's the attorney's obligation to ask questions, not the juror's obligation to read the attorney's mind in responding to questions. The juror was only asked whether he could be fairly impartial. He wasn't asked what TV shows he watches or anything that would have elicited a response of relating to American greed. And to Judge Boggs' point, you know, if we were to allow that question, is there any reason you can't be fair and impartial to allow post-verdict interviews for basically anything, a juror smiling, coming in, a juror giving a thumbs up? There'd be no end to these post-verdict interviews. The only other point. But it all depends on context, right? Because if you had certain things, people like to express views on things they wear every once in a while. And if a juror had come in with, you know, something that was more dramatic, it might have provided a reason for interview. So hang the bastards on the day that you're issuing a verdict might give you a sort of different feel about where that juror was coming from. It's not the same as, you know, a nod or a look away or a thumbs up or something like that. Sure. There could be a situation where some apparel worn by a juror to announce a verdict would be so clear and unequivocal as the language the Eleventh Circuit has used in Cuthel that it would justify a post-verdict interview. It would be good cause to interview that juror. Here we have a T-shirt that the only evidence in the record is it had the same name as a TV show that's about white-collar crime. The only evidence in the record is that that TV show is not actually, or that T-shirt, the specific one he was wearing, is not actually sold in connection with the show. So the several... There's evidence in the record about that? Or just argument of counsel about that? Well, it was proffered to the court by way of the prosecutor's research, research that I believe both Mr. Izaguirre and I conducted yesterday to confirm that there's no bright green shirt with black lettering sold in connection with the show American Greed. Well, but the district court didn't have that information. It did. It was in the United States response to the defendant's motion. It's in the record as part of your opposition to the request? That's correct. We have a docket, document number or some such? Not that this is getting pretty far into the weeds of the fashion industry. It's cited in my brief. I can give you the docket. Okay, we can find it then. You put in evidence that they don't dispute that this was not sold by the TV show. That's correct. Okay, you can go on. Were there any further questions about the juror issue? The only other comment I wanted to respond to by defense was with respect to the 404B evidence. The United States proffered prior to trial that the evidence about Giovanni Suarez and the threats would come in in two ways. First, through Jesus Perez, which is how it came in at trial, that there was this phone conversation after Mr. Nurey confronted Giovanni Suarez and that Mr. Perez made certain comments. That did come in at trial. There was other evidence proffered that never came in. That was evidence about Giovanni Suarez's own testimony that someone that looked like the defendant came and threatened him. Giovanni Suarez didn't testify in the case, so that never came into evidence. It's just a point of clarification on the record. If there's no other questions. Well, with regards to that evidence, one of Mr. Ysaguirre's arguments is that by then any conspiracy had ended and one of the members of that conversation was in another country. Well, as a factual matter, the conspiracy and the charge conspiracy hadn't ended. The charge conspiracy and the indictment goes through September of 2015. I believe this happened in June or July of 2015. Well, it's one thing to charge it. It's another thing to explain why it still went on. What was still going on at that time? The co-conspirators were still covering up their traits, their actions. They were conspiring to figure out what was going on. Was there an informant in their business? I believe that's around the same time that Raciel Leon, the office manager of the first home health care, Mercy, was destroying evidence. He was burning the kickback log from that home health care. The evidence is intrinsic in the sense that it's how this conspiracy learned that they were being uncovered, how they reacted to learning that there was an informant in their midst. So I don't think that it's technically extrinsic evidence at all. Even if it is, as Your Honor pointed out, it's clearly relevant to show the defendant's state of mind. His reaction to learning there was an informant in his midst was not, oh, that's strange. I wasn't doing anything illegal. It was to disassemble all of his phones. It was to communicate that to a co-conspirator. And it was when that co-conspirator said, I want to break his head to agree. So it shows his consciousness of guilt. It shows his awareness that what he was doing was wrong, which is an issue that's still being litigated on appeal. Did he act willfully? So it was an issue that was in dispute at trial. And this was highly probative evidence that he was, in fact, acting willfully in the payment of kickbacks. Let me shift on one of the other issues. Tell me about the one comment at closing that Mr. Narae, quote unquote, can't explain this. He can't explain why he got a quarter of a million dollars off this scheme. Why do you think that was an appropriate comment? Your Honor, the defense took the position in, I believe, the second line of their opening statement that while there was fraud here and while the defendant did profit immensely off it, that he was just a subcontractor, that he had no idea what was going on. This was entirely fair response to that comment. If you're going to concede that there's fraud, that everyone else was paying kickbacks and knew about it, that this defendant was receiving kickbacks but wasn't in on the fraud, there's no reasonable explanation for that. And that's all the comment was saying. In his opening, he admitted taking kickbacks and referring patients for them? No, sorry, Your Honor. He admitted that there was fraud going on at Mercy and that he wasn't involved in the fraud. That was the contention. And the point being, you're not going to get a quarter million dollars off of a fraud scheme if you're not involved. And that's all that comment's saying. If he's going to concede A and B, that there's fraud and that other people are in on it, and C, that the defendant was getting paid, then D follows. He can't explain. There is no reasonable explanation other than that he's involved. Well, this is just a suggestion that if you use, and I don't mean you personally, but if a prosecutor uses that sort of language, it's going to raise a red flag all the time. All the time about burden shifting. Even if in this case, it was proper comment in response to a defense theory floated during opening statement. That's only my view. I don't speak for my colleagues. Understood. Thank you, Your Honor. I guess the only other issue that I want to make clear for the court, because it may not have been clear from the briefing, is the issue of the little bit of testimony that may or may not be missing from Mr. Perez's transcript. This has to do with the claims of 404B evidence. So if you look at the transcript, this is docket entry 386 at pages 96 to 97. The prosecutor, Ms. Young, asked Mr. Perez, how do you know where the Medicare money is supposed to go for your home health care company? Mr. Perez responds, to the defendant's office. He came to me. He knew I was working at Mercy. Based on the review of this testimony and the summary witness at the end, it seems likely that Mr. Perez, in this little interval, there's one question missing. How did you meet the defendant? They met at La Caridad Home Health, where Mr. Narae was a patient provider. That's the evidence that was proffered in the 404B notice. If you look at docket entry 230 at 6, the only evidence that was proffered with respect to this issue was one sentence. Jesus Perez is likewise expected to testify that Narae recruited patients for other home health agencies and had been a patient recruiter since in or around at least 2012. So I don't think there's any need to remand this to the district court to flesh out the tiny bit of testimony that's missing. However, that testimony came in and it was plainly admissible, both as inextricably intertwined and 404B. I'm confused. Where are you getting recollection of what the testimony was if we don't have the transcript? Your Honor, if you look at the testimony of the last witness, Special Agent Farina, he testifies. He was in the courtroom. He was the case agent and he's asked something to the effect of, did Jesus Perez say how he met Carlos Narae? Yes, he said they met at La Caridad Home Health, which was the proffered testimony, which is the testimony that it's presumably based on Special Agent Farina's testimony, did in fact come in and it was testimony that they were challenging the admissibility of prior to trial and have raised to get on appeal. You said that based on a statement by Perez out of court or testimony in court? He was testifying based on what Mr. Perez said in court. Because he was the case agent. He was there. I'm still a little confused. You called it anticipated testimony by Mr. Perez is missing. Is it Perez's testimony that's missing? Perez's testimony is there. It's a tiny snippet of Mr. Perez's testimony that's missing. And the question and answer portion of the record, the reason I just read that question and answer from Mr. Perez's testimony that is in the record is because that's where the testimony is missing. The answer does not follow from the question. And then the subsequent question is, you just told the jury that you discussed the price of patience. There's a little bit of testimony missing and it's clear from the direct, but there's no need to remand to the district court to recreate that issue because it's a tiny snippet of testimony that really regardless of how it came in was plainly admissible. And even if there were issues with the admissibility, the overwhelming evidence is there's no chance of prejudice. I have a note here that the appellant didn't raise this. The government just pointed it out in the response brief. That's correct, Your Honor. Is that correct? So it wasn't something they raised in their initial brief? No. Okay. There's no further questions. The United States respectfully asks that the court affirm the defendant's conviction and sentence. Thank you. In rebuttal, sir. In regards to the government's arguments regarding the t-shirt being sold, I don't want to belabor the point, but when I did the research back a year ago, t-shirts were being sold by American Greed, the spinoff, with that slogan, which I quoted in my motion. I didn't make that up. That was quoted in my motion. I received it from the internet. In regards to the missing transcript, the government says that a snippet is missing. The witness, Jesus Perez, that was a witness who was going to discuss 404B evidence regarding home health named Solutions, which Mr. Norea, I believe, received some checks from. And he was going to discuss how it was they met. That is not in the transcript. The defense did not write that, did not make that an issue in their brief. And the government cites and says that the defense didn't cite to that specific issue in the brief in regards to a transcript. The reason why the defense did not cite to any part of the transcript, because it wasn't there. And the defense, maybe it was the defense's fault, looked through it in the transcript and never found it. And frankly, didn't imagine or believe that the transcript would not be complete. It was not within my realm of things to think about that the transcript was not complete. The government says what the testimony was. How much is missing? We don't, we don't know. The government is saying what was, what happened in the trial. They're saying it based on the testimony of a case agent. His recollection is as good as anybody else's. I think we need to go back to the district court and try to fill in the gaps in regards to the 404B. But we know if it's minutes of testimony, hours of testimony of what you've alleged. They were the ones that brought it up. I did some research and I went through the transcript of Jesus Perez and it makes no mention of Solutions Home Health or of any other home health agencies that Mr. Rene was working with in the past that they potentially worked with. And there's really no commentary as to how they met at La Caridad. All it says is I worked, meaning Jesus Perez, the informant worked at La Caridad. I'm not sure what it matters. What does it matter? What does it relate to? Well, they're saying it's, they're saying that all this 404B evidence is intertwined and they have to say the story of how they met. But how they met is not in the transcript. And any commentary regarding Solutions Home Health is also not in the transcript. I went through the transcript and I didn't see it in the transcript. That who met? Perez and? Mr. Narae met. There isn't any evidence from any other witnesses. I mean, there were a lot of moving players in this alleged scheme. Yes. Nobody testified. And a lot of them dealt with each other in different subgroups. Nobody testified about the relationship between Perez and Narae aside from Perez. In regards to their relationship, I don't want to mislead the court. I imagine so. But how they met, I think the only individual who would know that was Mr. Perez. How Mr. Narae met Mr. Perez? Is that? Yes. Yes. That testimony would be given by Mr. Perez. And I don't think any other witnesses that testified would know how they met. The other witnesses that testified became involved in the scheme later on. That was Joel Alvarez and his wife, as well as a receptionist who worked at Larkin Hospital who was selling prescriptions. But I thought other witnesses testified that Mr. Narae had worked at these other agencies. I don't. Right now, I don't imagine, based on the witnesses that testified, that there is that kind of testimony. I don't, again, I don't want to mislead the court into affirmatively saying that there isn't. I want to be disingenuous to the court. But I don't know that there was any other witness who would talk about how Mr. Perez and Mr. Narae met. Mr. Perez started this conspiracy with another individual who did not testify in the trial. He might be able to testify as to how Mr. Perez and Mr. Narae met. But that individual didn't testify. He pled guilty the day of trial. The other only witnesses that testified. Do you have an understanding what the missing testimony was? It is. Your client was there at trial. I mean, typically, we wouldn't remand in the district court. The parties would get together and tell us. Is it like a page that's missing? A couple of questions? It's evidence of 404B of my client's involvement in a home health agency by the name of Solutions. But is it pages, testimony, or you don't know? I have, frankly, I have no idea. They're saying it's not just that one sentence. They provided a stipulation to me regarding a couple of lines, maybe a page. Again, I don't want to speak for them. Regarding Solutions Home Health. But I... They provided you a stipulation about what was missing? Yes. But I could not agree to that stipulation. Because? I don't know that it's, in fact, accurate that it's missing more or less. I think it needs to be remanded to the district court. I mean, is the point that, in effect, they are conceding or offering what was said so that we could judge and the district court judged how bad it was, let's say, is it explicable? If you're contending that it was much worse, can you rely on simply the fact that the reporter messed up and didn't transcribe some portion? Or wouldn't you have an obligation to give us some idea of why it's much worse than what is in the record and what the government is willing to concede? Well, the government's willing to concede that it's this issue of this Home Health. Yeah. This is crucial to the actual brief because that was an issue that I... that was raised. So this is not a missing transcript of something that has nothing to do with this case or with this brief. No, but nevertheless, the issue is clearly raised in the sense that we've been talking about, is this legitimate 404B evidence? We seem to know something about it. And I would think you would at least want to assert or speculate why the missing part is much worse than what we're talking about. Yes, no, and it is more than... I imagine it is more than just solutions. There's no evidence of how they met, which again starts the whole conspiracy. Does anybody dispute that they met? No. What does it matter how they met? Because they met at another Home Health. Right. But I thought there was somebody else that talked about them working there. Which I believe not. He's the only individual who testified. Is the stipulation, proposed stipulation, in the record? I believe it's not, no. Okay. All right. I think your time is... Do you have anything? Thank you very much. We noticed you're court-appointed and we thank you for taking the case. Thank you, Your Honor.